May it please the Court, I am Alex Eiliff of Dorsey & Whitney, appearing on behalf of the plaintiff and appellant, Angela Ebner. With me today is Richard Silberberg, also of Dorsey & Whitney. Plaintiff in this case raises claims against Fresh, Inc., which has profited at the expense of consumers through the deceptive design and labeling of its sugar lip balm product. The District Court, on the basis of erroneous and inappropriate factual findings, dismissed plaintiff's claims without leave to amend. Now it's important in this case to distinguish between plaintiff's labeling claims and her design claims because entirely different legal standards apply to each. The legal standards governing plaintiff's design claims have nothing to do with safe harbor or preemption. Plaintiff's design claims are simply that the design of the product at issue here deceives consumers into throwing away the product before they're actually out of product while fully a quarter of the product remains concealed within an open tube. Now you've used the word concealed. So if you get down, I don't use this product, but I do use the lip balm. And when I get down to the bottom of the tube, that cutoff point, the place where the, whatever we're calling that place, where the razor blade cuts off the tube, I can see that there's more product in there. Now if I want to dig with a fingernail file or something else, I can access it. It's not concealed. It's obvious. Now you used the word concealed. Is there product concealed in this tube? If so, I didn't understand this argument from either the pictures or the description in your briefs or complaint. Your Honor, consumers can see the surface of what remains. But a reasonable consumer would not assume that that surface covers a quarter of the product below it. A reasonable consumer might assume that some remain. Why not? Because reasonable consumers would assume that once they have advanced the product as far as it will go, using a screw mechanism at the bottom of the product, and they have ceased to be able to apply it, that there is nothing remaining. Has Fresh put more product below that cutoff line than there is, by percentage, than there is? My understanding is, Your Honor, yes. Your understanding, and is that alleged in your complaint? Is there anything that... Yes. And what did you allege? We allege that a number of other products include, above the flush cut, the full amount of what's stated on the label. Now I've never seen, now again, I don't use, there are certain lip products I don't use, but there are certain products that I do use, and I don't know of any that don't have product below the flush cut. Your Honor, I think that the question of how many of them have a quarter of the product below the flush cut, about what reasonable consumers would expect is below the flush cut. Okay. Well, that was my question, counsel, and I didn't get a straight answer. So I think you allege that about 25 percent was below the flush cut, okay? And it is accessible. It's not concealed in that sense. It hasn't been put below the cap someplace or buried elsewhere in the container. It's at least, they at least know that there's some percentage of product below there. Now is the 25, does Fresh put more than, does the 25 percent represent something more than Burt's Bees puts in its lip balm, or Revlon puts in its lipsticks? My understanding is that it is, Your Honor. And is that alleged in your complaint? I don't know if it's alleged in our complaint that there is more below the flush cut. Okay. But this is at a motion-to-dismiss level. So if it hasn't been alleged in your complaint, then that's not something that would be before the district court or before this court, right? That's right, Your Honor. However, the question of whether reasonable consumers would expect for this particular product that what's below the flush cut is a quarter of the product. I guess, counsel, what I'm asking is, haven't you, aren't you arguing, making arguments now that you haven't alleged in your complaint? No. We have alleged in our complaint that consumers are not aware of how much is below the flush cut. Right. But you, but you're now making an argument that there is more hidden there than there is in comparable products where consumers might expect to find product below the flush cut by, you know, for years of, years of usage. No, I don't think that's the primary argument in our complaint. Well, does that, does that make a difference to your argument? In other words, if Fresh, is it necessary argument that Fresh has more below the cut than, say, Chapstick? No, it is not, Your Honor. Except that, in the sense that I think Judge Bybee is suggesting that, you know, you can look to common experience to know that everybody knows there's something below that cut, right? Every reasonable consumer should know that. I think the question of what reasonable consumers know about what is below the flush cut. Unless it's apparent. A matter of common practice and common knowledge. I think the question of how much, what is common practice. Well, that's what I asked you, though. You just said how much doesn't matter to your argument. I'm sorry, I didn't understand the question. I said just a few minutes earlier, you said how much was below the cut didn't matter to your case. Now you're saying it does. The amount that's below the cut matters a great deal to our case. The relative amount. So in other words, say, if it's not more than Chapstick, you don't have a case. No, Your Honor. I'm sorry. The relative amount as compared to other products is not relevant to our case. What matters is that it's there and that consumers don't know it's there. But they know it's there because you can see it. They can see the surface of what remains. Right. And, you know, stick a toothpick, you can see how far you can go, right? If you stick a toothpick in this, you can find out how far down it goes, but a typical consumer is not going to do that. Why not? Have you ever done it? Have I ever done it with a Chapstick? No, I have not. No, I've done it. I mean, you know, lots of people know there's, you know, stuff below the cut. It just might be sad. I mean, you're sort of, you know, a positive and a very naive, inexperienced, you know, consumer, saying like a six-year-old, something like that. Well, Your Honor, I think the question is— Not a reasonable consumer, I mean, in the American marketplace. Are you? I think what we're alleging is that a reasonable consumer would reach the end here based on all indications they have, the fact that they twisted it to the end, the fact they're scraping against plastic, and the fact that all they can see is the surface of what remains, and they would throw it away. Whether a reasonable consumer would use a toothpick to plumb the depths of what remains, I think is a factual question, and I personally wouldn't do that with a tube of Chapstick, or if I had this product, I wouldn't do it either. Doesn't the question of what's below, doesn't it go to your labeling claim rather than your design claim? No, Your Honor. The design claim is that the design of the lip balm deceives consumers into throwing it away while a quarter of the product is concealed within the tube. So the fact that a quarter of it remains within the tube below that flush cut is the basis of the design claim, because consumers throw it away while a quarter remains. In your opinion, that's a factual question rather than a legal question? That's correct. In other words, your view is that they must be deceived because there's something below the line? Is that it? What is? I'm curious about what the deception is, that's all. You can tell me. The deception is that the way this, since there's a quarter of the product included below that flush line, consumers believe that they're out of product, because they've twisted to the end, they've used down to the flush cut. Consumers don't know that a quarter remains below that flush cut, and so they throw the product away. Well, doesn't the market take care of that? In other words, they don't buy it again. Well, I think the question of whether the market will take care of that, whether reasonable consumers will ultimately become aware, is a factual question, and furthermore, whether a consumer, once the consumer throws it away, the consumer doesn't have a way of finding out that that much material remains below the flush cut. These are what you call the design and packaging claims, right? That's what you're addressing now? Correct. I'm addressing the design claims. Now, with respect to those claims, is it your position that the district court erred by not giving you leave to amend on those claims? Or just that you're standing pat on your complaint is now formed? Your Honor, our primary position on those is that the district court ignored allegations that we did make. However, to the extent that additional allegations regarding the extent of what reasonable consumers would be aware of, to the extent this court deems that they would be necessary to support our claim, then yes, we would argue that we should be allowed to. So it's only on the question, if it is a question of, as you say, of what a reasonable consumer would or should be aware of. Right. That's all. All right. Yes. The design claims are just governed by that question of what reasonable consumers should be aware of. I got you. Thank you. And in the Ninth Circuit, as explained in Williams v. Gerber products, the question of whether a reasonable consumer would be deceived is not typically suitable for resolution on a motion to dismiss, except in very rare circumstances. And this is not one of those circumstances. Now this question, this factual finding that the district court made here, that a reasonable consumer could not be deceived, was premised upon, sat upon a second factual finding the district court made that was also incorrect. But couldn't a court of appeals see that as a conclusion, not a factual finding? The facts were not in dispute. What facts were in dispute? Your Honor, the question of whether a reasonable consumer would be aware of what remained within the tube was a fact that was alleged in disregard by the district court. I think that that implies a certain amount of weighing of the evidence and determining by the district court what a reasonable consumer would be aware of. But it wasn't disputed. I don't think, at least on this record, it's not disputed. There's a container. There's a portion below which there is some contents that are not readily applied to the lip. But none of those facts are disputed, are they? That's why I ask you, was it a conclusion of law? Because when there's no fact that is disputed, then you don't have to go to try a fact to get an answer. I don't think. You tell me. Well, Your Honor, the facts that were in dispute are what a reasonable consumer would make of those facts you just described. But I'm asking you, isn't that a conclusion? No, Your Honor. The facts you described, which were the amount that were below the flush cut and the amount above the flush cut, those facts are not in dispute. The amount above, the amount below are not in dispute. However, the question of what a reasonable consumer would make of those facts, whether a reasonable consumer would believe, would understand from what they're seeing, that  is not in dispute. As far as I know, defendant has not acknowledged that reasonable consumers are unaware of what remains below the flush cut. Why is this a design question instead of a labeling question? I thought that they, I thought the amount below the flush cut had to go, went to your labeling question, that is, that they had failed to put down how much was usable on the label. And I thought that the design question went to the fact that we had this big clamshell on the weight in the bottom of the tube in an oversized package that made you think you were getting a whole bunch of product that you weren't getting. So, Your Honor, the amount that's below that flush cut is relevant to the design claim and the labeling claim, but not what I would describe as the packaging claims. So what you described with the weight, the oversized box, and so forth, I would describe as the packaging claims, which have to do with the box, the weight at the bottom of the container. The design claims have to do with the operation of this, of this product. How a consumer turns the bottom of the product to advance the material. If this, if this question, if this question, we were allowed to, this, this to go forward, would the kinds of findings of fact then have to involve engineers and discussions of how much paraffin was in here and whether you can get a cylindrical stack of, of lip balm to stand up without, without having some product in the bottom to anchor it? I mean, are all those questions that would have to come in here? Not necessarily, Your Honor, because there are multiple different ways that defendant could resolve this deception. You could argue they could do it without having as much material in there to anchor this, anchor. Okay. So we could have, we could have less, in other words, they put too much material in there to anchor it. You could argue that. You could also argue they could resolve the deception by including the full amount that's above the flush cut. The amount that's represented on the label, including that full amount above the flush cut. And then the material below the flush cut, which they argue is an anchor to keep this from falling off. Wouldn't that run afoul then of, of, of FDA regulations? No, Your Honor, under a 701.13, uh, the net quantity state assumes that something will be excluded. And what should be excluded here is material that consumers do not get to use. We allege they do not get to use it, uh, because they aren't aware it's there. Is there any case that construes the FDA labeling the law in that manner? Uh, no, Your Honor. That the net content should exclude what somebody believes is unusable? Uh, no, Your Honor. However, the definition of cosmetic, which is listed at 21- Well, the case law is against you. In fact, your cases go the other way, right? There are no cases, as far as I'm aware, that define net quantity to include material that cannot be used. Because that would be contrary to the definition of cosmetic at 21 U.S.C. 321-I, which indicates that a cosmetic is a material that is intended to be applied to the human body. We've alleged here that this was not included below the flush cut to be applied to the human body. As a result, if it wasn't intended to be applied to the human body, it was either there because Fresh wanted to profit more by increasing its turnover, or if it was there to serve as an anchor. In either case, it wasn't included to be applied to the human body and should be excluded as other material packed with the cosmetic. Well, I really didn't understand your briefs to be arguing this, but what you're arguing now is, amongst other errors, the district court erred by concluding that the net weight statement was accurate and complied with the FDA labeling law, right? That's correct. That's an error. That's an error? Yes. Counsel, I know that we've taken you down to the bottom of your time, and I assume that you had hoped to reserve some time for reply, but before you sit down, would you please address the preemption question? Yes, Your Honor. So the reason why we argue that there is no preemption here is that this representation, the net quantity statement, does not comply with the regulations at issue, with 21 CFR 701.13. And the reason it does not comply, as I stated, is that it includes material that consumers do not get to use. The reason why that's a violation is that if it's a net quantity, something must be excluded. What should be excluded here is material that isn't intended to be used. So can you cite me to the particular provision of the regulations that this violates? I would argue 701.13A and 701.13G, which state what should be included in the net quantity statement, as well as 21 U.S.C. 321I, which defines a cosmetic. And the quantity of cosmetic in the package is G. Does it say anything there about accessible or reasonably available, or what does it say? It says it should be an accurate statement of the net quantity of the cosmetic exclusive of wrappings and other material packed therewith. Now you added some words there that weren't there, counsel. You added the word net. Oh, I apologize. That's not in G. That appears in 701.13A, then. Right. The net of what? What we would argue is if it, as you can see there, it says 701.13, in 701.13G, it's exclusive of. Now, counsel, I asked you if you would address the preemption question. And what you did was tell me that you thought it violated the regulation. That's very different from a question of preemption. I disagree, Your Honor. The reason is that under Astiana and other Supreme Court precedent regarding preemption, the question of whether federal law, in particular this statute which was addressed in Astiana, whether federal law preempts state law claims depends upon whether a plaintiff is alleging what are called parallel requirements. And we are alleging here that the state law claims are parallel to the federal law claims. As a result, because we're alleging a violation of a federal law, the state law claims are permitted to proceed pursuant to the parallel proceedings doctrine, the case law regarding parallel proceedings. Did you only bring California claims? You didn't bring any straight-up federal violations? No, we did not, Your Honor. Why wouldn't you? If you thought that it violated 701.13A, why wouldn't you bring that claim as well? Your Honor, the enforcement authority for 701.13 is reserved for the FDA, as I understand it. The state law claims are the way that we can seek damages. So the federal claim that you claim is parallel to the state claim is one that can only be enforced by the FDA, but you now want us to come in and impose additional requirements by virtue of California law that you couldn't get under federal law. Is that correct? No, Your Honor. We are not seeking to impose additional requirements. We are saying that this is not an additional requirement because it's contained within the regulation. It's just a different remedy you're seeking. That's right. And that's permissible pursuant to Supreme Court precedent on this, Bates v. Dow AgriSciences and other cases. If we ultimately agreed with your claim and you prevailed in the district court, California would pretty much dictate the rest of the market, wouldn't it? Your Honor, I'm not sure if that's the case or not. I don't know whether other state law claims would be consistent with California law on this. I assume that most others... Really wouldn't matter. Wouldn't the manufacturer just simply manufacture everything to conform to California standards and market it every place else? If it did and that resolved the deception here, I don't think that would be a bad result in this case. All right. I will allow you a minute for rebuttal. We've consumed much of your time. Okay. Let's hear from Fresh, Inc. Good afternoon, Your Honors. I'm Stephen Smarrick from Winston and Strawn on behalf of Defendant Appellee Fresh, Inc. The first thing I'd like to address quickly is the standard of review. Obviously, this is a motion to dismiss. It's reviewed by the panel de novo. But in the standard for a motion to dismiss, plaintiff appellant here cites the abandoned no set of facts standard. And that obviously is not the correct standard after Twombaugh and Ickley as this court has recognized. So we point that out. And I think it's important to point out here because even from the argument, and there in this case, the theories here tend to converge and merge and swim around. And so every time a plaintiff appellant comes up into an obstacle with a particular legal claim, they try to shift the focus to a different legal claim to distract from that. That happened at the argument on the motion to dismiss. And I think that the lower court properly reviewed and applied the principles to the discrete claims that are being made here to find that it should be dismissed and it should be dismissed on the merits. At this point, I would like to point out that it was the amended complaint that was dismissed. All of these issues were raised. And there was a meet and confer. And there was leave granted to file an amended complaint. And so plaintiff appellant did have an opportunity to address in the pleading the arguments that we are presenting here today. Those are the same arguments that we have presented in the meet and confer that led to the amended complaint. And during the hearing and in the briefing, I don't think there was a request for leave to plead additional facts. Plaintiff appellant chose to rest on the facts as pleaded. With that, I think there are a couple of facts. And based on the questioning, they are very clear to the court that are not in question. First, all of the claims, the claims for false advertising under 17500, 17200, the CLRA claim, all of them arise from the same single fact that the package, which on the fresh sugar lip treatment states that the net quantity is 4.3 grams. So to start with, there was some discussion of what does net quantity mean. And we heard again for the first time here today, not in the papers, not in the record below, this argument that net quantity somehow means there's a quantity of product and then there's something else that's the net quantity of product. That's nowhere in the record. That's nowhere in any of the allegations. And quite frankly, that's nowhere in the statute or the law or the cases. Well, at the very least, your argument is it's a new argument. It wasn't raised either in the briefs or in the district court. At the very least, it's a new argument. But net quantity simply means net of everything else, net of the packaging that would accompany it. So we're talking about the weight of the product. So when we talk about net quantity or net weight, it's the weight of the product. And the reason that's important, we take this particular product as an example, Lip Balm. The court has mentioned a couple of brands of Lip Balm. And I'm not surprised because before I got in this case, I was limited in my knowledge of Lip Balms to similar brands that were mentioned, Chaps Bic or Burt's Bees. These are plastic containers. They're packaged completely differently. This is packaged sugar lip treatment. It's packaged in a metal canister like a high-end lipstick. It's sold in a higher-end store. And as alleged in the complaint, it's sold for up to $25 a stick, a tube. There's nobody who's paid $25 a tube for Chaps Bic or Burt's Bees at the local Rite Aid or CVS. This is a different market. To answer the panel's question about would this change the dynamic, would California then, California state law be dictating federally how the product would be sold, I would posit not only that, but it would be limiting the opportunities of retailers to do high-end packaging because the types of products that were alleged to be comparable are sold in plastic containers. And the comparison of the weights are the weight of those plastic containers versus weights of high-end containers. I wanted to address, again, the specific facts that are not in dispute. The FDCA and the section, it's 21 CFR 1701.13a and g, as the panel has discussed, specifically require the statement of the net quantity of the product on the package. This is not a case like Ostiana where there was additional statements made on the packaging that are allegedly giving rise to the claim. Here, the federal government and a corresponding California state statute require the labeling of net quantity on the package. That's the requirement that's imposed on the retailer. Here, fresh ink by the federal government. That's not in dispute. It's also not in dispute that the two that fresh ink actually sells includes the stated amount of product, 4.3 grams. And as your honors have already recognized, there's no dispute that whatever the amount above the flush cut is, and we are accepting the allegations alleged in the complaint as true, so we are not challenging the allegations about 25 percent being below, but we're also not conceding that. But accepting that as true, as your honors have already indicated, once you get to the bottom of the flush cut, it is apparent, visible, that there is more product below there, whether it's a lipstick tube, whether it's deodorant, or as the lower court used the example of toothpaste in a tube. Did the plaintiffs argue that the 25 percent was larger than comparable products? I believe at the hearing, I did not have a chance to go back through the trial transcript. I believe, excuse me, the hearing transcript. I believe at the hearing they made allegations to that effect. The fact is they, we didn't go down that road because those would be factual allegations, and I don't think. I'm just trying to figure out whether they pled it. Yeah. And I don't recall if it's in the complaint itself. I believe they may have raised that argument orally at the hearing. It's not contested that this tube has a metal slug at the bottom, right? There's a metal weight at the bottom of the tube that allows it to stand upright. That is correct. That weighs maybe, you know. Five grams, as alleged in the complaint. It weighs more than the product itself. It weighs more than the 4.3 grams in the product itself, and that's why. Now, is there something in the allegations or somewhere in the record as to what the purpose of that weight is? No, Your Honor. And as a matter of fact, in the arguments, one of the things we argued in the lower court in our motion to dismiss, and one of the things we argued again in the brief is that they made no allegations that that did not serve a purpose. And in order to even arguably invoke any of the packaging laws that they purport to invoke, they have to allege that these things don't perform a justifiable function. Here, in fact, the slug at the bottom allows the tube to sit upright and not be knocked over easily. And it's common in the lipstick industry. Essentially what we have here is the first in many cases, if this is allowed, against every type of lipstick container that's used. But we don't need to go into that factual issue. What are you suggesting, that it's a common practice in the lipstick industry? In paragraph, in page 3 of their report, they said, everybody, we don't, the whole allegation here is the only way you can apply this. Their allegation is the only way you can apply this is by rubbing the balm directly, pressing the stick to your lips. That's not true. And as the court has already recognized, it's visible and accessible to the consumer by, through other methods, a variety of other methods, which are also well known. In page, on page 3 of their reply brief, they say, well, everybody would understand that this tube allows the consumer to apply it through a preferred manner of pressing it directly against the lips. What they then don't want to accept, accepting that that's true, they don't want to accept that everybody would know that there is product below. And how much product below or not is there for the consumer to discover or not at the consumer's choice. And what I'm saying is that, yes, it would require a complete redesign of this product and every other lipstick, because it would require that something else would have to hold the lipstick or lip balm slug in place. Or you simply have to say, here's the net weight and here's the accessible product. So you could list something different. Except for the fact that that would then clearly be preempted under FDCA 21 U.S.C. 379-S. I don't think the plaintiff argues it that way. In other words, the plaintiff is saying, besides the net weight label that's required, I think another subsection of the same regulation permits supplemental labeling of the weight, right? And you could, in the supplemental labeling, say something like, well, you know, this product does weigh 4.3 grams, but in fact only 2.3 are accessible. You could say that, right? And it wouldn't violate the FDA regulation. In fact, it would be in accordance with the regulations, according to the plaintiff. And first, I would agree that that's the plaintiff's argument. Second, I would say the question is not what could be said, but what's required by law to be stated. And here ‑‑ No, no, no, no. Wait a minute now. That may be, you know, true as far as the preemption argument goes. But say, well, the plaintiff's case is, and I, you know, seems reasonable, not preempted because the California statute is the same as the federal. In other words, you have to state the net ‑‑ I'm talking about just labeling those. You have to state the net weight. But it's not a matter of preemption to say, plaintiff's saying, well, even though it complies with the FDA net weight regulations, it's still deceptive because it doesn't tell you how much product is usable. And the defendant can easily let the consumer know how much product is usable simply by a supplemental label, which is not, you know, which is permitted by the FDA regulations. What's wrong with that argument? Your Honor, I would say two things. First, the argument is premised on a fact that's false by virtue of the allegations pleaded in the complaint, and that is that there's any part of the product that's concealed or not usable. So it assumes first that there's only one method of applying the lip balm, and that's by pressing the stick directly to the lips. Oh, you mean the way ‑‑ But that's nowhere in the complaint. Maybe it's clear, but at least the way you read the complaint, there's no allegation that the portion of the product, you know, below, I'll call it below the cut line, is not reasonably usable to the ordinary consumer? Your Honor, I would say that that's a conclusion regarding the fact. The fact is that there, as alleged, the fact is there's one gram below the flush cut, and the fact is that that is visible to the consumer when they get to the end. Whether that's reasonably accessible or not, that's a conclusion, and I would say two things. One, fresh nowhere, nowhere indicates ‑‑ It's either a conclusion or a contested issue of fact, right? Well, fresh nowhere indicates that the only method for applying lip balm is by pressing it directly to the lips. And so what they're doing is they're suggesting that that ‑‑ No, but if you follow the plaintiff's case, the plaintiff's saying to the ordinary consumer, reasonable consumer, you know, the only accessible portion is down to the top of the, I'll call it the plug. And the rest is not ordinarily accessible or reasonably accessible. The rest say, whatever, 1, 1.2 grams. But the easy remedy to make the consumer aware of that is just to have a supplemental label saying, you know, 1.2 grams of this product is not reasonably accessible. You have to be a contortionist to get to it or something like that. The only thing I would say in response to that is that if this lawsuit imposed that as a requirement, it would be a requirement in addition to the net weight quantity that is imposed by 701.13A. So FDA regulation permits a supplemental label. Mr. Smirk, Mr. Smirk, in answering his question, wouldn't you have to be a magician to know what was reasonably accessible if you look in the lip line and you know there's a product beneath it? John Jones might get a toothpick and take it out. Samuel Smith might use his finger and take it out. Molly Green might take it out another way. You would have no way to know what is reasonably accessible unless everybody concedes that anything below the lip line is not reasonably accessible. Because the number of ways to access it would vary with the users. There would be 100 users and they would access it a different way unless you can't access it. And I gather from this record you can access it. It's there. You see it. And you can get it out if you want to or you can throw the tube away if you want to and go buy another tube. But you aren't required to do either one of the two. Now, I don't know that that's the answer, but I expected you to go in that direction as you were attempting to answer my brother's questions. And you are exactly right. Well, I would expect you to say that. I'm glad I met at least one of your two expectations. If there are no other questions, then. Thank you. Thank you. Thank you. Mr. Arloff. I made that point because I want you to rebut it. You don't have to do it at the beginning, but at some point. I'll do what I can, Your Honor. I have just three points to make here. The first is, in the complaint, we do allege that fresh is an outlier with regard to its statement about how much is above the flush cut. We would also be prepared to amend to establish that it's an outlier. And which paragraph of the complaint? In the complaint, do we allege that it's more? I'd have to pull to my papers. However, we specifically cite Burt's Beads with regard to the amount that's above the flush cut being the equivalent of what's stated on the label. The amount below the flush cut, therefore, is excess in Burt's Beads. We'd also be prepared to amend to establish that it's fresh as an outlier with regard to the amount below. The second issue is the reason why we think fresh is an outlier is that it profits from this behavior. It profits by increasing its turnover. If people throw it away more often, they buy it more often, and they increase their sales. What makes fresh an outlier? We allege that they are an outlier because they include more. We don't allege, I'm sorry. We allege they're an outlier because of how much they include above the flush cut, and we are prepared to amend to allege that they're an outlier also with the percentage below the flush cut. But what the district court found in this case is that fresh has no profit motive. I'm sorry, has no what? Has no profit motive to do this. Yeah, right, which I think was a clear mistake. I think we all understand that. Then I won't proceed on that any further. The last point I have, then, is simply that this question that you raise, Your Honor, regarding whether individuals can access what's below the flush cut, I think, as you described, there might be ways. There are certainly conceivably ways that you could do that. Might be simple and readily accessible ways. If that's not so, then it doesn't matter if you've got to go get some kind of device and squeeze a tube with that. But it's readily accessible, isn't it? But readily accessible, I think the answer is no, because consumers are unaware. So the question— Unaware of what? Unaware that there's something left in the bottom of the tube? That there's a significant amount of material remaining below. Can't they see it? All they can see is the surface of what remains. And a reasonable consumer would take that to mean that there is a superficial layer. Not that that surface hides a quarter of the stated amount of the product. That's what a reasonable consumer would assume. I personally would look at that and think that. That's what a reasonable consumer would assume. And at the least, it's a factual question about what a reasonable consumer would understand to be below that superficial layer that they can see. We contend that a reasonable consumer would not be aware that there was a significant amount of product remaining and therefore would never think to attempt any of the methods you describe, whether it's a finger or a toothpick or anything like that. As a result, it was entirely possible for reasonable consumers to be deceived in this case. And the district court's order should be reversed on those grounds. Or on the alternative, plaintiffs should be permitted to amend. Okay. Thank you. We thank both counsel for the argument. With that, the court has completed the oral argument calendar for the day.
judges: farris, Tashima, Bybee